UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LIZ MARIE COLÓN QUIÑONES, FREDDIE I. VALENTÍN QUIÑONES, DAVID A. TORRES QUIÑONES, MICHAEL JEFFREY LANDRAU QUIÑONES AND THEMIS T. PÉREZ QUIÑONES (REPRESENTED BY HER FATHER ANGEL OMAR PEREZ CARDONA), BY THEMSELVES AND AS HEIRS OF THEIR MOTHER NILDA QUIÑONES | CIVIL NO.   05-1537  (DRD) |
| Plaintiffs | MEDICAL MAL PRACTICE |
| V. | JURY TRIAL |
| DR. RAFAEL OTERO HERNANDEZ, HIS WIFE JANE DOE AND THEIR LEGAL CONJUGAL PARTNERSHIP; ASOCIACIÓN DE ORTOPEDAS SAN FRANCISCO, INC.,  SAN FRANCISCO HOSPITAL, UHS OF DELAWARE, INC., DR. ROBERTO BETANCES CARRERAS, HIS WIFE MAE ROE AND THEIR LEGAL CONJUGAL PARTNERSHIP; DR. GUILLERMO VILLAMARZO, HIS WIFE LUCRECIA FERNANDEZ, AND THEIR LEGAL CONJUGAL PARTNERSHIP; DR. RAFAEL RAMIREZ WEISER, HIS WIFE SANDRA ROE, AND THEIR LEGAL CONJUGAL PARTNERSHIP; AND HATO REY PATHOLOGY ASSOCIATES | |
| Defendants | |

## SECOND AMENDED COMPLAINT

TO THE HONORABLE COURT:

COME NOW plaintiffs Liz Marie Colón Quiñones, Freddie I. Valentín Quiñones, David A. Torres Quiñones, Michael Jeffrey Landrau Quiñones and Themis T. Pérez Quiñones, (represented by her father Angel Omar Pérez Cardona) by themselves and as heirs of their mother Nilda Quiñones, through the undersigned attorney, and respectfully state, allege and pray as follows:

## I. JURISDICTION

The jurisdiction of this court is invoked under the provisions of title 28 U.S.C. §§ 1332 (a)(1), as it is between citizens of different states.

This action is of a civil nature, arising under articles 1802 and 1803 of Puerto Rico's Civil Code, and in excess of $75,000.00, exclusive of interests and costs.

## II. THE PARTIES

1.    Nilda Quiñones-Figueroa was a citizen of the United States of America, domiciled in the state of Florida.   She died on January 10, 2006.  She was the mother of the five plaintiffs.

2.    Co-plaintiffs are the following persons.  Liz Marie Colón Quiñones is 19 years old, with social security number 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.  She is an adult according to the laws of the state of Florida, where she lives at 16149 Southwest, 139th Avenue, in Miami.  Lizmarie has taken under her care the custody and legal matters related to her brothers, coplaintiffs Freddie Valentín, David Torres and Jeffrey Landrau. Freddie is 17 years old, with social security number 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; David is 12 years old, with social security number 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; Jeffrey is 11 years old, with social security number 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.  Coplaintiff Themis Thaiz Pérez Quiñones is three years old, with social security number 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.  She lives and is represented in this suit by her father Angel Omar Pérez Cardona at 14538 South West 170 Terr., Miami, Florida, 33177.

3.     Co-plaintiffs' are the sole heirs of Nilda Quiñonez and her causes of action arising out of the general and special damages she suffered due to the independent or joint negligent acts or omissions of defendants, as explained hereinafter.

4.     Dr. Rafael Otero is a physician, authorized to practice medicine in Puerto Rico.  He specializes in orthopedic surgery. He is married to codefendant Jane Doe.  They are coadministrators of the Otero & Jane Doe Conjugal Legal Partnership.   Dr. Otero has professional liability insurance that covers risks, occurrences and/or damages similar to the ones claimed in this complaint.

5.     At the time of the facts herein alleged, codefendant Dr. Rafael Otero was the owner and/or one of the partners of Asociación de Ortopedas San Francisco.

6.     Codefendant "Asociación de Ortopedas San Francisco, Inc.," is a partnership authorized to do business in Puerto Rico. It is liable for, and has a policy that covers its liability for damages caused by the negligence of co-defendant Dr. Otero in the practice of medicine, and for damages caused by the negligent acts or omissions of its employees.

7.     Codefendant San Francisco Hospital owned, administered and/or operated the medical facility known as "San Francisco Hospital" in Puerto Rico, where plaintiff Nilda Quiñones was admitted as a patient on April 30, 2003.  It still

owns and/or operates other medical facilities in Puerto Rico, including the San Juan Capestrano Hospital.

8.    San Francisco Hospital has a self insurance program and/or primary and/or excess or umbrella insurance policies that covers risks, occurrences or damages like the ones claimed in this complaint.

9.    Codefendant UHS of Delaware, Inc., is a corporation incorporated in Delaware, authorized to do business, and with its principal place of business in a state other than Florida.  At the time of facts herein alleged, it is or was the (co) owner and/or (co) administrator and/or (co) partner of codefendant San Francisco Hospital.    UHS has a self insurance program and/or primary and/or excess or umbrella insurance policies that covers risks, occurrences or damages like the ones claimed in this complaint.

10.    Codefedant Hato Rey Pathology Associates (HRPA) is a partnership authorized to do business in Puerto Rico.  At the time of the facts herein alleged, the owners or partners of HRPA were codefendants Dr. Rafael Ramírez and  Dr. Guillermo Villamarzo.  HRPA has primary and/or excess or umbrella insurance policies that cover its liability for damages caused by its medical practitioners, including codefendant Dr. Roberto Betances.  Said policies also cover HRPA's liability for damages caused by the negligent acts or omissions of its employees and agents.

11.    Dr. Rafael Ramírez is married to codefendant Sandra Roe.  They are

4

coadministrators of the Ramírez-Roe conjugal legal partnership.   All of them are liable for any damages caused by the negligent acts or omissions of HRPA, its employees, agents and medical practitioners.

12.    Dr. Guillermo Villamarzo is married to codefendant Lucrecia Fernández. They are coadministrators of the Ramírez-Roe conjugal legal partnership.   All of them are liable for any damages caused by the negligent acts or omissions of HRPA, its employees, agents and medical practitioners.

13.    Codefendant Dr. Roberto Betances Carreras is a physician authorized to practice medicine in Puerto Rico, specialized in pathology.  He is married to Mae Roe.   They are coadministrators of the Betances-Mae Roe conjugal legal partnership.  All of them are liable for the medical malpractice of Dr. Betances.  Dr. Betances has professional liability insurance that covers the risks, occurrences and/or damages similar to the ones claimed in this complaint.

### III. FACTS AND ALLEGATIONS

14.    On March 2003, Nilda Quiñones-Figueroa, visited a general practitioner in Puerto Rico seeking treatment for a small bump in her right ankle.

15.    Said doctor referred Nilda for treatment to co-defendant Dr. Rafael Otero.

16.    On or around April 29, 2003, Nilda visited Dr. Otero for the first time at his offices in Asociación de Ortopedas San Francisco.

17.    Dr. Otero examined Nilda and determined she had a benign abscess or lipoma in her ankle.

18.    Dr. Otero did not considered cancer as a potential rule-out diagnosis of the mass in Nilda's ankle.

19.    In his office, Dr. Otero attempted to drain the abscess, with the use of a small scalpel.

20.    Since he could not drain it, Dr. Otero told Nilda that ambulatory surgery was needed to explore and remove the lipoma.

21.    On April 30, 2003, Nilda was admitted as a patient in San Francisco Hospital.

22.    As part of the admission process, the personnel of San Francisco Hospital gave several documents to Nilda for her signature.  One of those was titled "Consentimiento Informado Para Procedimientos Quirúrgicos y/o Especiales".  Said document authorized San Francisco Hospital to perform any studies it deem advisable ("estudios que sean necesarios") to any tissues removed from Nilda's body during the course of the surgery.

23.    On May 1, 2003, the ambulatory surgery took place.  The process performed by Dr. Otero was an incision, drainage and bone sauceration (exploration of the ankle). Dr. Otero's post operative diagnosis was "benign lipoma".  Dr. Otero did not consider cancer as a post-operative rule-out diagnosis.

24.    At the time of the surgery, codefendants HRPA, Hospital San Francisco and UHS had executed a contract titled "Pathology Laboratory Services Agreement". Pursuant to it, HRPA exclusively provided pathological examinations to tissues, organs or other body parts removed during surgery procedures at the San Francisco Hospital.

25.    Pursuant to the written authorization given by Nilda and the pathology services agreement, San Francisco Hospital consulted and sent the removed mass to HRPA for a pathology examination.

26.    When Nilda woke up from the anaesthesia, she was informed by hospital personnel that there had been no complication.  She was also told to return in a week to Dr. Otero's office for the removal of the stitches.

27.    Neither Dr. Otero nor the personnel of San Francisco Hospital informed Nilda that the mass or tissue removed from her body was to undergo a pathology examination by HRPA.

28.    At the time of Nilda's discharge from San Francisco Hospital on May 1, 2003, the results of the pathology examination to be performed by HRPA were not available.

29.    Pursuant to Hospital San Francisco's Medical Staff By- Laws, Nilda's medical record was incomplete and without a final diagnosis at the moment of discharge.  Additionally, said medical record could not be permanently filed until it

was completed by Dr. Otero or ordered to be filed by the Medical Records Committee.

30.    On or around May 6, 2003, HRPA rendered a pathology report, signed by defendant Dr. Betances, diagnosing that the mass removed from Nilda's ankle was cancerous (synovial sarcoma) and not a benign lipoma.  Said diagnosis of cancer was accurate.

31.    Pursuant to the services agreement with San Francisco Hospital and UHS, codefendants HRPA and/or Dr. Betances were responsible for the proper delivery of this pathology report.

32.    Pursuant to the best practice of medicine, codefendants HRPA and Dr. Betances had to directly contact Dr. Otero to inform him the positive result for cancer. They never made such direct contact.  Instead, that duty was delegated to a secretary and/or transcriptionist of HRPA.

33.    Pursuant to HRPA's own regulations and practice, the secretary and/or transcriptionist had to notify the pathology report by telephone and fax to Dr. Otero, and to his office by messenger.

34.    On or around May 8, 2003, Nilda visited Dr. Otero's office to have her stitches removed.

35.    By that visit, HRPA claims that a copy of the May 6, 2003 pathology report had been faxed to Dr. Otero's office, and another copy delivered by messenger.

36.    However, a copy of the May 6, 2003 pathology report is not found in Dr. Otero's medical record.  Additionally, HRPA and Dr. Betances never talked to Dr. Otero directly to verify that he had received and seen the report.

37.    During the May 8, 2003 visit, Dr. Otero did not inform or discuss with Nilda the May 6 pathology report.  Also, he did not call or ask his secretary to call HRPA and/or Dr. Betanes to inquire about the report.

38.    After removing the stitches, Dr. Otero discharged Nilda from his office. He did not refer her to an oncologist.  He did not order treatment for the synovial sarcoma in her ankle.

39.    In the meantime, HRPA sent a sample of the tissue to the National Cancer Institute (NCI), who confirmed the cancer diagnosis through a report dated May 22, 2003.

40.    In light of the NCI report, on or around June 2, 2003, codefendants HRPA and Dr. Betances rendered another report confirming the diagnosis of cancer.

41.    HRPA and Dr. Betances did not notify the June 2, 2003 report to Dr. Otero by fax or telephone. HRPA claims that a copy of NCI's report and HRPA's June 2, 2003 report was sent by messenger to Dr. Otero's office on June 3, 2003.

42.    Dr. Otero never contacted or informed Nilda about  NCI's or HRPA's June 2, 2003 report.  Dr. Otero did not actually see any of these reports until he was notified with the complaint in this case.

43.   San Francisco Hospital received on May 6, 2003 the first report of HRPA, and on 6/3/03 the second report of HRPA, with the NCI report attached to it.

44.   San Francisco Hospital never sent, informed or contacted Nilda about any of these reports.

45.   San Francisco Hospital did not notify or discuss the pathology reports with Dr. Otero, Asociacion de Ortopedas de San Francisco, HRPA, or Dr. Betances.

46.   The Cancer Committee of San Francisco Hospital never met to discuss the cancer diagnosis of Nilda.

47.   San Francisco Hospital did not notify Dr. Otero that the medical record of Nilda was incomplete and without a final diagnosis.

48.   San Francisco Hospital  never suspended the privileges of Dr. Otero for keeping the record of Nilda incomplete and without a final diagnosis.

49.   Eventually, San Francisco Hospital ordered the permanent filing of the medical record of Nilda Quiñones.

50.   None of the defendants notified the biopsy results to the Department of Health or any other state administrative agencies (or department therein) of the Commonwealth of Puerto Rico.

51.   On July 1, 2003, unaware of the cancer diagnosis, Nilda moved with her children to the state of Florida.

52.   Around November-December 2003, Nilda noticed another bump on her right ankle.

53.    In January 2004, she visited general practitioner Dr. Fausto Castillo in Florida, who ordered several medical tests, including an MRI.

54.    As a result of these medical tests, it was determined that Nilda had a tumor in her right ankle.

55.    Around January and/or February 2004, Nilda was referred to orthopedist Dr. Joseph Ovadia, who ordered more tests and eventually informed surgery was needed to remove the tumor.

56.    This surgery was performed on April 1, 2004, and a pathology examination was requested.

57.    One week after the surgery, Nilda returned to Dr. Joseph Ovadia's office to have the stitches removed.  He ordered her to return on a weekly basis for examination of the wound.

58.    At the end of April 2004, the pathology result arrived and  Dr. Ovadia informed Nilda that the tumor removed was cancerous.

59.    Dr. Ovadia advised Nilda to obtain a copy of her medical records at San Francisco Hospital.

60.    When the record was made available, Nilda took it to Dr. Ovadia, who informed her that during the surgery in Puerto Rico a tumor had been removed, that a pathology examination had been performed and that the results had been positive for synovial sarcoma, an aggressive type of cancer.

61.    This was the first time Nilda Quiñones was informed about HRPA's and NCI's malignancy reports.  She was about to find out the extent of the damages caused by the negligent acts or omissions of defendants.

62.    Dr. Ovadia informed Nilda that in order to prevent further spreading of the cancer, her right leg had to be amputated.  He also referred Nilda to the Jackson Memorial Hospital for a second opinion.

63.    Nilda was seen at that institution by Dr. David Pitcher, who confirmed Dr. Ovadia's diagnosis.

64.    If Nilda had received the proper and necessary medical treatment from codefendants in Puerto Rico, the cancer would have been cured and/or would not have spread or grow throughout her leg and body. However, as a result of defendants' negligent acts and omissions, the cancer did spread.

65.    Dr. Pitcher tried an aggressive round of chemotherapy, for which Nilda was hospitalized.  This therapy caused her nausea, vomits, diarrhea, weakness, loss of her hair, and depression.

66.    The chemotherapy was not effective, and the cancer continued to spread and grow, particularly in Nilda's leg and lungs.

67.    In October 2004, Nilda's right leg was amputated, below the knee.  She had to ambulate using a wheelchair, walker, and later a prosthesis.  The amputation of her leg represented a 32% permanent whole body impairment.

68.    Nilda was subjected to several more ineffective rounds of chemotherapy to attack the cancer in her lungs.

69.    During the last days of her life, Nilda and coplaintiffs suffered greatly: Nilda had severe chest pains and constantly took pain killers; she constantly used an oxygen tank and mask to breathe; she returned to use a wheelchair and eventually became bedridden, as she was too weak to walk.

70.    Around November 2005, co-plaintiff's were informed that there was nothing else to do to keep their mother alive.  At that moment, the family had to take the heart-breaking decision of removing the artificial life assistance that was keeping Nilda alive, and began preparations for her funeral.

71.    The physical pain and mental anguishes that Nilda Quiñonez experienced during this stage affected her and co-plaintiff's greatly, who had to miss about a month of school to be at their mother's side, expecting her impending death.

72.    On January 10, 2006, Nilda Quiñonez died of cancer complications. She was 35 years old.

73.    Among other reasons, codefendants Dr. Otero, his wife Jane Doe and their conjugal legal partnership are liable for Dr. Otero's negligent treatment of Nilda Quiñones, his or Asociación de Ortopedas' failure to have an established protocol in his office to deal with malignancy reports, his failure to inform Nilda about the pathology examination and its results, and his failure to timely refer her to an

oncologist, all of which allowed and/or contributed to the growing and/or spreading of the cancer and her death.

74.     Among other reasons, codefendant Asociación de Ortopedas San Francisco is liable for the negligent acts or omissions of its employees and those of Dr. Otero.

75.     Among other reasons, codefendants Dr. Betances his wife Sandra Roe, and their conjugal legal partnership are liable for Dr. Betances' failure to properly deliver the pathology report or make sure it had been properly delivered, and his failure to contact Dr. Otero in order to inform and/or discuss the pathology reports.

76.     Among other reasons, codefendants HRPA, its partners Dr. Rafael Ramírez and Dr. Guillermo Villmarzo, their wives Sandra Roe and Lucrecia Fernández, and their respective conjugal legal partnerships are liable for HRPA's failure to comply with the best practice of medicine with regards to the notification and proper delivery of positive cancer results, for the negligent acts or omissions of HRPA's employees in the notification and/or proper delivery of the malignancy reports, for the medical malpractice of Dr. Betances, and for failing to comply with HRPA's contractual obligations of obtaining excess and umbrella insurance policies of up to $2 million dollars on behalf of San Francisco Hospital and UHS, and $1 million dollars on behalf of Dr. Betances.

77.     Among other reasons, codefendants Hospital San Francisco and/or UHS are liable for the hospital's negligent failure to notify or inform Nilda that a

14

biopsy was going to be performed and the results thereof; for failing to contact, inform or discuss with Dr. Otero the biopsy results; for the failure of its Cancer Committee to discuss Nilda's case and stage her disease; for failing to notice or notify Dr. Otero that Nilda's medical record was incomplete and without a final diagnosis at the time of discharge; for failing to suspend Dr. Otero's privileges for keeping Nilda's medical record incomplete and without a final diagnosis; for permanently filing Nilda's medical record without a final diagnosis and incomplete; for their negligent failure to have in place, or ensure that HRPA had in place, adequate protocols requiring that all malignancy reports be properly notified to the patient; finally, it is vicariously liable for the negligent acts or omissions of HRPA and Dr. Betances.

78.    As a result of the negligent acts or omissions of all defendants, Nilda and the plaintiffs suffered the following estimated damages:

> a.    Nilda Quiñones-Figueroa's physical pains, mental anguishes and special damages prior to her death (medical expenses and economic damages), inherited by her children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000,000.00
>
> b.    For each of co-plaintiffs Liz Marie Colón Quiñones, Freddie Valentín Quiñones, David Torres Quiñones, Michael Landrau

> Quiñones and Themis Pérez Quiñones' own
>
> physical pains, mental anguishes and special
>
> damages prior to and after Nilda's demise
>
> (including economic loss and funeral
>
> expenses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,000,000.00

79.    All these damages were caused by the combined or individual negligent acts or omissions of defendants, so they are jointly and severally liable to plaintiffs.

80.    Plaintiffs demand a trial by jury.

WHEREFORE, it is respectfully requested from this Honorable Court to grant a judgment against co-defendants for the sums here requested together with prejudgment interest, costs, and reasonable attorneys' fees.  Grant plaintiff such other relief as it may deem proper and necessary.  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, plaintiff hereby request trial by jury in this action.

At San Juan, Puerto Rico, this 6 April, 2006.

I HEREBY CERTIFY that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  (1) Sigrid López González, sigrid@prtc.net; (2) María Z. Trigo-Ferraiuoli,   mariezori@hotmail.com;   (3)   Carmen   M.   Vivas-Pietri,

cvivas@montijolaw.com.    (4)    Miriam    Gonzalez-Olivencia    mirig@caribe.net,

mglaw@hotmail.com.

Respectfully submitted,

**S/ LUIS G. MARTINEZ-LLORENS**
LUIS G. MARTINEZ LLORENS
Bar Number: 211509
Attorney for Plaintiff
**COLÓN, COLÓN & MARTÍNEZ, P.S.C.**
        **ATTORNEYS AT LAW**
Postal: PO Box 9023355
            San Juan, PR 00902-3355
Street:  255 Ponce de León Suite 1201
            San Juan, PR 00917-1926
Tel: (787) 758-6060 ext. 232
Fax: (787) 753-1656
E-mail: lgmartínez@colonlaw.com

ICG/mcc

US 060404 Second Amended Complaint.LMLwpd.wpd